THE PEOPLE *ex rel.* E. C. Akin, Attorney General,

*v.*

JOSEPH KIPLEY *et al.*

*Opinion filed December 22, 1897—Rehearing denied February 4, 1898.*

1. CIVIL SERVICE—*foundation principles of the Civil Service act.* The foundation principles of the Civil Service act are, that appointments to municipal offices must be made according to merit and fitness, to be ascertained by competitive examinations free to all, and that promotions in public service must be according to merit.

2. SAME—*legislature of Illinois has power to pass a civil service act.* The legislature of Illinois has power to provide that appointments to municipal offices or positions shall be made according to merit and fitness, to be ascertained by competitive examination.

3. SAME—*Civil Service act not unconstitutional in requiring competitive examinations as tests.* The Civil Service act of 1895 (Laws of 1895, p. 85,) is not unconstitutional in requiring examinations, as therein provided, as tests for appointment to office, nor in requiring promotions to be made as therein specified.

4. SAME—*act not unconstitutional as delegating judicial power to commissioners.* The Civil Service act of 1895 is not unconstitutional as delegating judicial power to the civil service commissioners under sections 12, 14 and 33 of that act.

5. SAME—*provisions concerning punishment for contempt not unconstitutional.* The provisions of sections 33 and 34 of the Civil Service act, (Laws of 1895, p. 93,) concerning punishment of parties for contempt, are not unconstitutional, as the orders for production of papers, etc., are made by the circuit court upon application of the commissioners, and the punishment as for contempt is inflicted by such court for disobedience of its orders.

6. SAME—*provisions concerning contempt not violative of right of trial by jury.* Those parts of the Civil Service act which provide for the summoning of witnesses, production of books and papers, etc., and for the punishment, as for contempt, of parties disobeying an order of the court in that regard made upon application of the commissioners, are not unconstitutional, as violating right of trial by jury.

7. SAME—*provisions concerning the investigation of charges against appointees are not unconstitutional.* Section 12 of the Civil Service act, which provides for investigation by the commissioners of charges against appointees and for their removal from office, is not unconstitutional, as authorizing the deprivation of property without a trial by jury, as a public office is not property, nor are the prospective fees of such office the property of its incumbent.

8. SAME—*act is not unconstitutional as being special legislation.* The Civil Service act of 1895 is not unconstitutional as being obnoxious to the constitutional inhibition against special legislation, as the act itself provides for its operation only in those cities which may adopt it by a vote of the people.

9. SAME—*part of section 35 of the Civil Service act is unconstitutional.* That part of section 35 of the Civil Service act (Laws of 1895, p. 93,) which provides that persons found guilty of a violation of the provisions of that act shall be disqualified from holding public office for five years after conviction is unconstitutional, but such provision, being separable, does not invalidate the act.

10. SAME—*construction of words "heads of any principal department," as used in section 11.* The words "heads of any principal department," as used in section 11 of the Civil Service act, refer to the chief office in each principal department as such office existed under city ordinances in force when the act was passed. (BOGGS, J., dissenting.)

11. SAME—*what does not constitute a "head of a principal department."* Neither the fact that a city officer or employee is authorized to exercise control in the absence of the chief officer of the department, nor that he has charge of hiring men and expending public money and is next in position to his chief officer, nor that he has confidential and business relations with the chief officer in any branch of the city service, constitutes him a "head of a principal department." (BOGGS, J., dissenting.)

12. SAME—*construction of words "whose appointment is subject to confirmation by the city council."* The words "whose appointment is subject to confirmation by the city council," as used in section 11 of the Civil Service act, refer to any official whose appointment, at the time of the passage of that act, was made by the mayor with the consent of the council, whether such official was the "head" of any principal department or not.

13. SAME—*exemption from classified service cannot be extended by ordinance.* The number of officials who are exempt from classified service under section 11 of the Civil Service act cannot be increased by a city, after adopting the act, by an ordinance providing that certain subordinate city officers and employees "shall be designated as heads of principal departments, and shall be appointed by the mayor and shall be confirmed by the city council."

14. SAME—*offices included under classified service.* Except as otherwise expressly provided in section 11 of the Civil Service act, all offices in any principal department of city government of lower grade than the chief or head office of the department, or subordinate thereto, including the offices of superintendent, inspectors and captains of police, are under classified service, except in those cases where, at the time the Civil Service act was passed, such

subordinate offices were filled by the mayor with the consent of the council. (BOGGS, J., dissenting.)

15. MANDAMUS—*when demand and refusal to perform duty need not be shown.* The writ of *mandamus* lies to compel the performance of a public duty or the enforcement of a public right, and in such case no demand and refusal need be shown.

16. SAME—*petition for mandamus must set forth a clear right.* A petition for *mandamus* must set forth a clear right on the part of the relator to have the act performed and a plain duty on the part of the respondent to act.

17. SAME—*mandamus lies to compel compliance with Civil Service act. Mandamus* lies to compel the head of the police department of a city working under the Civil Service act to notify the civil service commissioners of vacancies in his department, as provided in section 10 of that act, and to compel the commissioners to certify the names of persons eligible under the law to fill such vacancies.

PHILLIPS, C. J., dissenting.

ORIGINAL petition for *mandamus.*

At the June term, 1897, of this court, to-wit: on June 1, 1897, the Attorney General filed a motion for leave to file an original petition for *mandamus.* Leave was granted to file the petition, and it was so filed on June 2, 1897. The petition prays for summons to Joseph Kipley, superintendent of police of Chicago, and Adolf Kraus, Dudley Winston and Hempstead Washburne, civil service commissioners, requiring them to answer the petition.

The petition alleges that vacancies exist in the positions of assistant superintendent of police, inspectors of police and captains of police; that such positions have not been filled in accordance with the terms of the "Act to regulate the civil service of cities;" that, upon the occurrence of such vacancies, it was the duty of the superintendent of police, as the head of the department of police of the city of Chicago, to notify the civil service commissioners of said city of such vacancies; that, upon such notification, it was the duty of said commissioners to submit to the said superintendent of police the names of not more than three applicants in each grade or class

next below the grade or class, in which the vacancy existed, for promotion to such vacancies; that said superintendent of police claims the power to fill vacancies in the positions of assistant superintendent of police, inspectors of police and captains of police in said city; that, in violation of the provisions of said act, said superintendent has assumed to fill some of such vacancies by appointing persons not in the classified lists formulated by said civil service commission, and not designated or selected by the said commission for appointment or promotion; that said superintendent has attempted to appoint one Lyman Lewis, as assistant superintendent of police, and one John J. Harkness, as inspector of police. The petition further alleges the passage of the "Act to regulate the civil service of cities" on March 20, 1895, the adoption of the same by the city of Chicago at the general city election held on April 2, 1895, the proclamation of George B. Swift, then mayor of said city, issued on July 1, 1895, declaring the adoption of said act, and that the same was in full force after the date of said proclamation, the appointment by said Swift, as mayor, on July 1, 1895, of three civil service commissioners under said act, to-wit: John M. Clark, Robert A. Waller and Christoph Hotz, the qualification of said commissioners, and the adoption by said commissioners of certain "civil service rules," which rules are appended as an exhibit to said petition.

The petition further alleges, that, on April 6, 1897, Carter H. Harrison was elected mayor of said city as the successor to said Swift, and qualified as such mayor; that, thereafter, said Waller resigned his position as one of said civil service commissioners, and said Clark and Hotz were removed from said commission by the said Carter H. Harrison, mayor; that the respondents, Winston, Kraus and Washburne, were appointed commissioners in place of said Clark, Waller and Hotz, and have duly qualified and are acting as such commissioners.

The petition also alleges, that the rules of the first board of commissioners, which were adopted as aforesaid, have not been altered or changed; that, by such rules, the old board of commissioners, in the year 1895, classified the offices of assistant superintendent of police, inspectors of police and captains of police, and thereby brought them within the terms and provisions of said Civil Service act; that, by an opinion in writing addressed to the mayor and signed by the respondents who constitute the present board of commissioners, and promulgated on or about May 22, 1897, the positions of assistant superintendent of police and inspectors of police were held by the present board of commissioners not to be required to be classified under said act, and to be exempt from the rules and regulations of said commissioners. The petition also sets forth ordinances of the city of Chicago, showing that before, and at the time of, the passage of the Civil Service act, there was established an executive department of the municipal government of Chicago, known as the "Department of Police," embracing the superintendent of police and other officials; that there was created the office of superintendent of police, who should be the head of said department of police, and should hold his office for the term of two years, and until his successor should be appointed and qualified. The ordinances referred to in the petition also provide, that said superintendent of police shall be appointed by the mayor by and with the advice and consent of the city council. It is also alleged in the petition, that, prior to the passage of said Civil Service act, ordinances had been adopted by the city council of Chicago, relating to the department of public works, the department of health, and other departments, by which a head of each department was established in terms similar to the provisions relating to the department of police. The petition represents, that, on April 15, 1897, the respondent, Joseph Kipley, was, by Carter H. Harrison, mayor of said city, appointed superintendent of police,

and was afterwards duly confirmed by the city council, and qualified as such superintendent, and caused the city to be divided, or accepted a division of said city theretofore made, into four divisions and fifteen districts, and assigned, or recognized as having been assigned, to each division an inspector of police, and to each district a captain of police.

The petition prays that a writ of *mandamus* may issue to the said Joseph Kipley, as superintendent of police, directing and commanding him to notify the civil service commissioners of vacancies, existing in the positions of assistant superintendent of police, inspectors of police and captains of police in said city, and to said Kraus, Winston and Washburne, as such civil service commissioners, commanding them to submit to said Kipley as such superintendent of police, the names of not more than three applicants for promotion for each vacancy from the grade next below that in which such vacancy or vacancies exist, etc.

On June 14, 1897, the respondent, Kipley, filed a separate answer, in which, among other things, he set up that the said Civil Service act was unconstitutional and void. The said answer admits, that the present civil service commissioners on May 22, 1897, promulgated the opinion mentioned in the petition, holding that the positions of assistant superintendent of police and inspectors of police were not required to be classified under said Civil Service act, and were exempt from the rules and regulations of the said commissioners. The answer avers, that the true construction of the third and eleventh sections of said act, if the same have any force or validity, is stated in the opinion of May 22, 1897, a copy of which opinion is annexed to the answer and made a part thereof. The answer also adopts and makes a part thereof, a certain opinion dated May 5, 1897, given by Charles S. Thornton, corporation counsel of said city, to the said Carter H. Harrison, mayor, therein holding that said positions of assistant

superintendent of police, inspectors of police and captains of police, and other subordinate positions in the departments of public works, of buildings, of health, of fire and of police, are not required to be classified under said act, and are exempt from its provisions and from the rules and regulations of the commissioners. The answer of the respondent, Kipley, avers that the said respondent has followed the construction of the provisions of said act, as given in the opinions aforesaid. The answer further sets up, that the respondent neither admits nor denies, that, by the rules referred to in the petition, the first board of civil service commissioners for the year 1895 classified the offices of assistant superintendent of police, inspectors of police and captains of police, as stated in the petition; but in his answer, the said Kipley positively denies, that the said positions were by said rules, or could be, brought within the terms and provisions of said Civil Service act. The answer furthermore admits the existence of the vacancies in the department of police referred to in the petition, and that the said respondent, Kipley, has caused the same to be filled. On June 15, 1897, the People by the Attorney General demurred to the answer of the respondent, Kipley.

On June 14, 1897, the respondents, Kraus, Washburne and Winston, civil service commissioners aforesaid, filed their answer to the petition, and filed and annexed thereto a copy of the answer filed by them in another proceeding for *mandamus* instituted against them as civil service commissioners at the same time, at which the present proceeding was instituted, but to which the said Kipley was not made a party defendant. The said civil service commissioners also adopt, as a part of their answer, the answer filed herein by said Kipley, except so much of Kipley's answer as attacks the validity and constitutionality of said Civil Service act. The answer of said commissioners admits the appointment of Lyman Lewis, as assistant superintendent of police, and of John J. Hark-

ness, as inspector of police by the said Kipley, and alleges that, as said Lewis and Harkness are not made parties to the petition, the petition is defective.

The answer of the respondents, Kraus, Winston and Washburne in the proceeding for *mandamus*, commenced against them alone and without joining Kipley, and which is made a part of their answer in the present proceeding, refers to and endorses and adopts the said opinion promulgated by them and addressed to the mayor on May 22, 1897. The answer of the commissioners, by the adoption of said opinion, and of their answer in the other proceeding, claims that certain positions in the police, fire and health departments, and in the departments of buildings and of public works in the city of Chicago other than the heads of those departments, as mentioned in the ordinances referred to in the petition, are not required to be classified under the Civil Service act, and are exempt from its provisions. The positions, claimed by the commissioners in their answer to be thus exempt and not subject to classification, are in the department of public works, the following positions, to-wit: secretary to commissioner of public works, city engineer, superintendent of streets, superintendent of water, superintendent of sewerage, superintendent of special assessments, superintendent of maps; in the department of buildings: secretary to commissioner of buildings, deputy commissioner of buildings; in the department of health: assistant commissioner of health; in the department of police: secretary of the department of police, assistant superintendent of police, inspector of police; in the fire department: first assistant fire marshal, superintendent of city telegraph, fire inspector, secretary of fire department, etc. On June 15, 1897, the People, by the Attorney General, filed a demurrer to the answer of the respondents who are civil service commissioners.

Subsequently, after the adjournment of this court in the June term, 1897, and on the 28th day of June, 1897,

the city council of the city of Chicago passed an ordinance entitled "An ordinance to designate certain public officials who shall be selected by the mayor with the concurrence of the council," which ordinance is as follows:

"*Be it ordained by the city council of the city of Chicago:*

"SECTION 1. That the following list of public officials shall be designated as 'heads of principal departments' as said term is used in section 11 of 'An act to regulate civil service of cities,' approved and in full force March 20, 1895, and shall be nominated by the mayor and shall be confirmed by the city council, viz.: city engineer, superintendent of streets, superintendent of water, superintendent of sewerage or sewers, superintendent of special assessments, superintendent of water-pipe extension, superintendent of city pipe-yards, secretary of the police department, assistant superintendent of police, fifteen captains of police, four inspectors of police, chief sidewalk inspector, assessor of the water department, district foremen of street repairs, district foremen of water-pipe extension, district foremen for sewer cleaning, district foremen for street cleaning.

"Sec. 2. All ordinances or parts of ordinances inconsistent herewith are hereby repealed.

"Sec. 3. This ordinance shall take effect and be in force from and after its passage."

This ordinance was approved by the mayor, Carter H. Harrison, on July 1, 1897.

On July 10, 1897, the respondent, Joseph Kipley, superintendent of police, filed a plea in this court, setting up that, since the filing of his answer to the petition herein and since the last adjournment of the court, the city council of Chicago had adopted the said ordinance of June 28, 1897. The plea then sets forth said last mentioned ordinance in full, and alleges that the same is in full force and effect, and that thereby the respondent's failure to notify said civil service commissioners and to submit to them the appointment of certain subordinate police offi-

cers of said city have been, if they ever were within the same, wholly taken away from and removed out of the control, jurisdiction and power of the said civil service commissioners, and that such matters are now expressly excepted by the terms of said ordinance from the force and effect of the Civil Service act.  The plea then quotes in full sections 3 and 11 of said act, and submits said last named ordinance to the court to be read and construed in view of said sections.   On October 18, 1897, the Attorney General filed a demurrer to said plea.

EDWARD C. AKIN, Attorney General, (SMITH, BLAIR & SMITH, EDWIN BURRITT SMITH, and MURRY NELSON, Jr., of counsel,) for petitioner:

The proceeding of *mandamus*, as established by statute, is an action at law.   *Dement* v. *Rokker*, 126 Ill. 174; *People* v. *Crabb*, 156 id. 155.

The allegations of the petition not traversed by sufficient averments in the answer stand admitted.   The substantive allegations of the petition are not denied, and therefore are admitted.   *Railroad Co.* v. *Suffern*, 129 Ill. 274.

The act concerning civil service in cities is constitutional.   *Owners of Lands* v. *People*, 113 Ill. 296; *Opinion of Justices*, 138 Mass. 601; *People* v. *Chase*, 165 Ill. 527.

The act is remedial, and should be favorably construed with reference to the evils that prompted it.  It is adopted from the national, New York and Massachusetts acts, and brings with it the construction placed upon it by the courts of those jurisdictions.   Lieber's Herm. (Ham. ed.) 159; Potter's Dwarris, 73, 231; *Wolcott* v. *Pond*, 19 Conn. 597; *Soby* v. *People*, 134 Ill. 66; *Railroad Co.* v. *Heflin*, 65 id. 366; *Rigg* v. *Wilton*, 13 id. 15; *Streeter* v. *People*, 69 id. 595; *Matter of Keymeyer*, 148 N.Y. 219; *Chittenden* v. *Wurster*, 152 id. 345; *Rogers* v. *Buffalo*, 123 id. 173; *United States* v. *Curtis*, 12 Fed. Rep. 824; *Ex parte Curtis*, 106 U. S. 371.

The act is in the nature of an amendment of the act concerning cities and villages.   The powers of the city

council are not such as to enable that body, by ordinances of "definition," to defeat its purposes. The act concerning cities and villages should not receive an unreasonable construction. *Soby* v. *People*, 134 Ill. 66; *East St. Louis* v. *Renshaw*, 153 id. 491; *Hawes* v. *Chicago*, 158 id. 653; *Bloomington* v. *Railroad Co.* 134 id. 451; *Tugman* v. *Chicago*, 78 id. 405; *Cairo* v. *Feuchter*, 159 id. 155; *Caldwell* v. *Alton*, 33 id. 416; *Bloomington* v. *Wahl*, 46 id. 487; *Title Guarantee* v. *Chicago*, 162 id. 505; *Palmer* v. *Danville*, 154 id. 156; *Lake View* v. *Tate*, 130 id. 247; *Huesing* v. *Rock Island*, 128 id. 465.

*Mandamus* is the proper remedy. *Brokaw* v. *Commissioners*, 130 Ill. 482; *People* v. *Board of Education*, 127 id. 613; *Dement* v. *Rokker*, 126 id. 174; *People* v. *Getzendaner*, 137 id. 234; *County of Pike* v. *People*, 11 id. 202; *Swift* v. *Klein*, 163 id. 269; *Railroad Co.* v. *Suffern*, 129 id. 274.

CHARLES S. THORNTON, for respondent Joseph Kipley:

Policemen are not municipal officers, but rather State officers. (Dillon on Mun. Corp. secs. 210, 975.) This doctrine is fully recognized in the case of *Culver* v. *Streator*, 130 Ill. 238.

The Civil Service act is void, in that it delegates the legislative power to the commission, the right to exercise which is solely vested by the constitution in the General Assembly. *Kilbourn* v. *Thompson*, 103 U. S. 168.

Section 35, in addition to a penalty by fine and imprisonment, provides for disqualification for holding office. A crime thus punishable is not only infamous, but must be prosecuted by indictment. *Inter-State Commerce Com.* v. *Brimson*, 154 U. S. 447; *United States* v. *Waddell*, 112 id. 76; *Ex parte Wilson*, 114 id. 417.

The statute contains no provision which protects the witness from the danger of self-incrimination. It is therefore in this particular inimical to the constitution. *Brown* v. *Walker*, 161 U. S. 591; *Counselman* v. *Hitchcock*, 142 id. 447.

The kind of trial and judgment by the commission provided by the Civil Service act, and which trial, as deter-

mined by the punishment, is a criminal prosecution, is clearly not according to the constitutional requirement of section 9 of article 2, which compels it to be had by an impartial jury, in the presence of a duly constituted court and judge, and in the county or district in which the offense is alleged to have been committed. *In re McLean*, 37 Fed. Rep. 648; *Puterbaugh* v. *Smith*, 131 Ill. 199; *Kilbourn* v. *Thompson*, 103 U. S. 168; *In re Pacific Railway Co.* 32 Fed. Rep. 241; *People* v. *Chase*, 165 Ill. 527; *Inter-State Commerce Com.* v. *Brimson*, 154 U. S. 447; *Counselman* v. *Hitchcock*, 142 id. 547.

That an offense the punishment for which involves a disqualification to hold office is thereby made infamous, see *Ex parte Wilson*, 114 U. S. 417.

THOMAS A. MORAN, JOHN W. ELA, and LEVY MAYER, for the civil service commissioners:

The demurrers in each case must be carried back to the petition. *People* v. *Crabb*, 156 Ill. 155.

No present necessity for relief is shown. *Cristman* v. *Peck*, 90 Ill. 150; *People* v. *Curyea*, 16 id. 547; *North* v. *Trustees*, 137 id. 296.

There is no sufficient showing that the acts required to be done by these respondents fall within their legal duties. *People* v. *Mount Morris*, 145 Ill. 427; *People* v. *Lieb*, 85 id. 484; *Swigert* v. *Hamilton County*, 130 id. 538; *People* v. *Elgin*, 66 id. 507.

Future or contingent cases cannot be anticipated on *mandamus*. It is not a substitute for mandatory injunction. 2 Spelling on Ex. Rem. sec. 1385.

The occasion for action by these respondents has not yet arrived, as shown by the petition. Civil Service act, secs. 9, 10, 13.

This defect goes to the whole petition. *People* v. *Yates*, 40 Ill. 126; High on Ex. Legal Rem. (3d ed.) sec. 440.

The petition is defective in form. *People* v. *Mount Morris*, 145 Ill. 427.

As the petition asks more than in any event it shows grounds for demanding, it is bad.    *People* v. *Supervisors*, 1 Hill, 50; *Regina* v. *Twitty*, 2 Salk. 434; *Rader* v. *Township Union*, 43 N. J. L. 518.

The power of appointment to all offices not reserved to the disposition of the Governor may be placed where the legislature determines.    *People* v. *Morgan*, 90 Ill. 562.

The civil service system of appointment is a proper one for legislative adoption.    130 Mass. 601; 145 id. 587.

The Civil Service law is not local or special legislation.    Its referendum provision is valid.    *People* v. *Hoffman*, 116 Ill. 601; *Cummings* v. *Chicago*, 144 id. 566; *Park Comrs.* v. *McMullen*, 134 id. 170.

The power of investigation given to the commissioners, whether for general purposes under the act or for purposes of removals from office, is not judicial, in the sense that powers exercisable only by the courts are conferred on the commission.    *Inter-State Commerce Com.* v. *Brimson*, 154 U. S. 447.

The powers of the legislature are plenary, and no limitation appearing in the constitution to the contrary, all agencies necessary to carry out the administration of the law may be established.    *People* v. *Hill*, 163 Ill. 186.

The power of enforcing the giving of evidence before the civil service commission is constitutional.    *Inter-State Commerce Com.* v. *Brimson*, 154 U. S. 476.

The city council has no power to make a statute, which affects cities and villages, apply in some instances and not in others.    Such optional power is unconstitutional. *People* v. *Cooper*, 83 Ill. 585; Const. sec. 22, art. 4.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

*First*—The civil service commissioners, who are respondents in this case, do not set up in their answer the unconstitutionality of the Civil Service act, nor do they adopt that part of the answer of the respondent, Kipley,

the superintendent of police, which attacks the constitutionality of the law. But the respondent, Kipley, in his answer expressly alleges, that the act is unconstitutional, and relies upon its unconstitutionality as a defense to the matters and things set up in the petition. By the demurrer filed by the petitioner to the answer of Kipley, the question of the constitutionality of the law is directly raised. The plea filed on July 10, 1897, setting up the ordinance of June 28, 1897, is a plea *puis darrein continuance.* That plea relies upon the ordinance of June 28, 1897, as a defense, and, under the technical rules applicable to such a plea, it may be that the defenses set up in the answer of Kipley are superseded and the substantive averments of the petition confessed. It has been held that, where a plea *puis darrein continuance* is filed, everything is confessed except the matter contested by the plea. (*City of East St. Louis* v. *Renshaw,* 153 Ill. 491). In this view, it would seem to follow that the question of the constitutionality of the law, as raised in the answer of Kipley, has been waived by the filing of the plea *puis.* Counsel for the respondent, Kipley, insists that, in an original proceeding by *mandamus* in this court, the question of the constitutionality of the act can be raised at any time before the issuance of the peremptory writ, irrespective of the filing of the plea of *puis darrein continuance.* He contends that the court will not in such a proceeding enforce by *mandamus* an unconstitutional law, if, at any time in the progress of the proceedings, such unconstitutionality is made apparent, and is brought to the attention of the court. This contention receives some support from the following remark made by this court in *People* v. *Town of Mount Morris,* 145 Ill. 427: "It has been held that defects in substance in the petition may be taken advantage of at any time before granting the peremptory writ." Without determining, however, whether the contention thus made by counsel is absolutely correct or not, we deem it proper to dispose of the question of the constitutionality of the act, in view of

the fact that the counsel for the respondent, Kipley, furnishes us with an elaborate argument against its constitutionality, and the petitioner, and the respondents, who are civil service commissioners, present equally elaborate arguments in favor of its constitutionality. The subject is thus urged upon our attention by all the parties to this controversy.

The Civil Service act, passed by the legislature of this State on March 20, 1895, is not the first law of its kind which has appeared in this country. Such a law has been passed by the Congress of the United States to be applied to the civil service under the Federal government. Statutes of the same kind have also been adopted in the States of Massachusetts and New York. The civil service law, which was in force in the State of New York for more than ten years before the year 1894, had so commended itself to popular approval, and had been so beneficent in its results, that its underlying principle was embodied in the new or amended and revised constitution of that State, adopted by the people in 1894, and which went into effect on January 1, 1895. The provision upon this subject in the New York constitution of 1894 is as follows: "Appointments and promotions in the civil service of the State, and in all the civil divisions thereof including cities and villages, shall be made according to merit and fitness, to be ascertained, so far as practicable, by examinations, which, so far as practicable, shall be competitive.  *  *  * Laws shall be made to provide for the enforcement of this section."

The evils, sought to be remedied by legislation of this character, are well known and well understood. These evils are such as grow out of what is generally called "the spoils system" in the matter of appointments to public office. This system rests upon what Mr. Justice Peckham, now of the Supreme Court of the United States, then a member of the Court of Appeals of the State of New York, speaking for the latter court in *Rogers* v. *Com-*

*mon Council of Buffalo*, 123 N. Y. 173, calls "the semi-bar-
barous maxim, that to the victors belong the spoils." .
Under the system thus designated as "the spoils system,"
party service and party fealty are made the tests for
appointments to office. Wherever this system prevails,
political work, done by the applicant, and his supposed
power to do more, are regarded as the chief reasons for
his appointment to office. Public office is thus made to
be the reward for political work. All the offices are "par-
celed out by the chiefs of the victorious party to their
faithful followers in recognition of past political services,
or in expectation of future support of the same nature.
Possession of office, under such a system, is to be the re-
ward of party fidelity and party service." (*Rogers* v. *Com-
mon Council of Buffalo, supra*). Where an appointment is
made under the system in question, the officer making it
is apt to ignore any sense of personal or official responsi-
bility to the people, and to substitute in its stead a feeling
of responsibility to his party only. The appointments to
offices are such as the leading men therein choose to ask
for. (*Rogers* v. *Common Council of Buffalo, supra*). Where
civil service laws have been adopted, they have been so
adopted for the purpose of doing away with the evils
which necessarily result from "the spoils system." Those
evils have been fitly characterized as inefficiency, ex-
travagance, the interruption of public business by place
hunters, corruption of the electoral franchise, and politi-
cal assessments. A distinguished writer on the consti-
tutional history of the United States has spoken of the
maxim, "to the victors belong the spoils," as being "an in-
violable principle of American politicians," and he says:
"It is owing only to the astonishing vitality of the people
of the United States, and to the altogether unsurpassed
and unsurpassable favor of their natural conditions, that
the State has not succumbed under the onerous burden of
the curse." (2 Von Holst's Const. Hist. of U. S. 26). To
do away with the onerous burden of this curse in the

cities of Illinois, the act of March 20, 1895, was passed by the legislature of this State.

The foundation principles of the act are, that appointments to municipal offices or employments must be made according to merit and fitness, to be ascertained by competitive examinations, free to all; and that promotions from lower to higher grades in the public service must be made upon the basis of merit. That this is so, will appear from an examination of the various provisions of the act. Section 3 of the act provides for the classification of all the offices and places of employment in any city, which has adopted the act, with reference to the examinations therein provided for, with certain exceptions; and that the offices and places, so classified by the civil service commission, shall constitute the classified civil service of the city. Section 6 provides, that all applicants for offices or places in such classified service, with certain exceptions, shall be subjected to examination, which shall be public, competitive and free to all citizens of the United States, with specified limitations as to residence, age, health, habits and moral character; that such examinations shall be practical in their character, and shall relate to those matters, which will fairly test the relative capacity of the persons examined to discharge the duties of the positions to which they seek to be appointed, and shall include tests of physical qualifications and health, and, when appropriate, of manual skill; that no questions in any examination shall relate to political or religious opinions or affiliations. Section 8 provides that, from these examinations, the commission shall prepare a register for each grade or class of positions in the classified service of the city of the persons, whose general average standing, upon examination for such grade or class, is not less than the minimum fixed by the rules of such commission, and who are otherwise eligible; and that such persons shall take rank upon the register as candidates in the order of their relative excellence, as determined

by examination, without reference to priority of time of examination. Section 9 provides, that the commission shall, by its rules, provide for promotions in such classified service, on the basis of ascertained merit and seniority in service and examination, and shall provide, "in all cases where it is practicable," that vacancies shall be filled by promotion; that all examinations for promotion shall be competitive among such members of the next lower rank as desire to submit themselves to such examination; that it shall be the duty of the commission to submit to the appointing power the names of not more than three applicants for each promotion having the highest rating. Section 10 provides that, "the head of the department" or office, in which a position classified under this act is to be filled, shall notify said commission of that fact, and said commission shall certify to the appointing officer the name and address of the candidate standing highest upon the register for the class or grade to which said position belongs, with a certain exception in regard to laborers; that the appointing officer shall notify the commission of each position to be filled separately, and shall fill such place by the appointment of the person certified to him by said commission therefor, etc. Section 34 provides, that any person who shall, willfully or through culpable negligence, violate any of the provisions of this act, or any rule promulgated in accordance with the provisions thereof, shall be guilty of a misdemeanor, and shall, upon conviction thereof, be punished by a fine of not less than $50 and not exceeding $1000, or by imprisonment in the county jail for a term not exceeding six months, or both such fine and imprisonment in the discretion of the court.

In 1884 the State of Massachusetts passed a civil service act, whose general provisions are substantially the same as those of the Illinois act now under consideration. The Supreme Court of Massachusetts, being requested by the House of Representatives in that State to give their

opinion upon the constitutionality of certain provisions of the act, held that the legislature has the constitutional right to provide for the appointment of civil service commissioners, and to delegate to them the power to make rules, not inconsistent with existing laws, to guide and control their discretion, and the discretion of the officers of the cities in whom the appointing power is vested; that the duty of determining and ascertaining the qualifications of such officers and servants cannot be performed directly by the legislature, but must be delegated to certain officers or agents; that it is not a delegation of power to enact laws, but merely a delegation of administrative powers and duties; that there was no provision of the constitution, which prevented the legislature from enacting that such rules, when duly made, should be binding upon the officers and citizens to whom they apply, and that they might be enforced by suitable penalties; that the power of the legislature to make or to authorize local laws for the administration of local affairs was beyond question. (*Opinion of the Justices,* 138 Mass. 601).

In 1883, the legislature of the State of New York passed a civil service law, which is similar in most of its features to the Illinois act. In *Rogers* v. *Common Council of Buffalo, supra,* it was held, that the provision of the act, which creates a board of commissioners consisting of two or more persons, and which provides that not more than a certain proportion shall be taken from one party, does not amount to an arbitrary exclusion from office, or to a general regulation requiring qualifications not mentioned in the State constitution, and is not unconstitutional; and that a provision therein, which required an applicant for appointment to a position in a public office to show his fitness therefor, was not an illegal test within the meaning of the constitution. In the course of the opinion delivered by Mr. Justice Peckham in the latter case, he says: "Looking at it as a matter of common sense, we are quite sure that the framers of our organic law never

intended to oppose a constitutional barrier to the right of the people through their legislature to enact laws, which should have for their sole object the possession of fit and proper qualifications for the performance of the duties of a public office on the part of him who desired to be appointed to such office. So long as the means adopted to accomplish such end are appropriate therefor, they must be within the legislative power. The idea cannot be entertained for one moment, that any intelligent people would have consented to so bind themselves with constitutional restrictions on the power of their own representatives, as to prevent the adoption of any means by which to secure, if possible, honest and intelligent service in public office. * * * Statutes looking only to the purpose of ascertaining whether candidates for an appointive office are possessed of those qualifications, which are necessary for a fit and intelligent discharge of the duties pertaining to such office, are not dangerous in their nature; and in their execution they are not liable to abuse in any manner involving the liberties of the people."

The Illinois act contains a similar provision to that in the New York act, namely: that not more than two members of the civil service commission shall, at the time of appointment, be members of the same political party. Section 31 of the Illinois act provides, that no comptroller, or other auditing officer of a city which has adopted the act, shall approve the payment of, or be in any manner concerned in paying any salary or wages to any person for services as an officer or employe of such city, unless such person is occupying an office or place of employment according to the provisions of law, and is entitled to payment therefor. Section 32 provides, that no paymaster, treasurer or other officer or agent of a city which has adopted the act shall willfully pay, or be in any manner concerned in paying any person any salary or wages for services as an officer or employe of such city, unless such person is occupying an office or place of employment ac-

cording to the provisions of law, and is entitled to payment therefor.

The New York act provided, that clerks and other subordinates in the civil service of the State should be appointed or selected from lists produced, as therein provided, after competitive examination, and that it should be unlawful for the comptroller to pay the compensation of any clerk in the civil service, who had not been appointed pursuant to the provisions of the law, and whose name had not been certified to him by the civil service commission. In *People* v. *Roberts*, 148 N. Y. 360, the facts showed, that the relator was appointed to a certain position without having passed the civil service examination, and that his name had never been certified to the comptroller by the civil service commission, and that for that reason the comptroller refused to pay the claim. It was there held, that the relator was not entitled to a *mandamus* to compel the comptroller to pay him the salary attached to such position, in the absence of a certificate from the civil service commission that he had been duly appointed pursuant to the Civil Service act; and the act was there held to be constitutional, the court saying: "The power of the legislature to enact the law, as it appears on the statute book, has never been doubted or questioned." Again, in *Chittenden* v. *Wurster*, 152 N. Y. 345, which was an action brought by tax-payers of the city of Brooklyn to enjoin the fiscal officers of the city from paying the salaries earned by them to certain employes, who were appointed to their positions without competitive examinations, it was held that the New York act, with the exception of a provision which exempted certain soldiers and sailors from competitive examination where the compensation did not exceed four dollars per day, was not repugnant to the constitution of the State. (See also *Peck* v. *Belknap*, 130 N.Y. 394; *Matter of Keymer*, 148 id. 219).

The act, passed by the legislature of Illinois on March 20, 1895, is not unconstitutional in requiring examinations

as therein provided for, as tests for appointments to public office, nor in requiring promotions to be made in the manner therein specified, nor in attaching a penalty to the violation of the provisions of the act. The act does not delegate legislative power to the civil service commissioners by authorizing them to make the rules therein provided for. In this State, when the General Assembly creates a municipal government, it has the power to provide the manner of filling the offices of such government. The legislature may select any means for the administration of the municipal government which it thinks best adapted to that end. It may provide for the election of municipal officers by the people, or may authorize any officers or persons to fill the offices by appointment. (*People* v. *Morgan,* 90 Ill. 558). It has, therefore, the right to enact a law, which provides that appointments to municipal offices or positions shall be made according to merit and fitness, and that such merit and fitness must be ascertained by competitive examination. In most instances before the passage of the Civil Service act, the municipal officers, having the power to make appointments to office, removed their appointees at their own pleasure. It is certainly not a violation of the organic law to require them to conform to and obey regulations, which make merit and fitness the necessary qualifications for office.

It is contended, however, by counsel for the respondent Kipley, that the act is unconstitutional and void upon the alleged ground, that it delegates to the civil service commissioners the exercise of judicial functions. This contention rests upon the character of the provisions contained in sections 12, 14 and 33 of the act. Section 12 provides, that no officer or employe in the classified civil service of any city, who shall have been appointed under said rules and after said examination, shall be removed or discharged except for cause upon written charges and after an opportunity to be heard in his own defense; that such charges shall be investigated by or before said civil

service commission, or by or before some officer or board appointed by said commission, to conduct such investigation; that the finding and decision of such commission or investigating officer or board, when approved by said commission, shall be forthwith enforced by such officer; that, in the course of an investigation of charges, each member of the commission, and of any board so appointed by it, and any officer so appointed, shall have the power to administer oaths, and shall have power to secure by its subpœna both the attendance and testimony of witnesses, and the production of books and papers relevant to such investigation. Section 14 provides, that the commission shall investigate the enforcement of the act and of its rules, and the action of the examiners therein provided for, and the conduct and action of the appointees in the classified service in its city, and may inquire as to the nature, tenure and compensation of all offices and places in the public service thereof; and that in the course of such investigations, each commissioner shall have power to administer oaths, and the said commission shall have power to secure by its subpœna both the attendance and testimony of witnesses, and the production of books and papers relevant to such investigations. Section 33 provides, that any person who shall be served with a subpœna to appear and testify, or to produce books and papers, etc., under the orders of the commission in the course of such investigations above specified, and who shall refuse or neglect to appear or to testify, or to produce books and papers relevant to said investigation, as commanded in such subpœna, shall be guilty of a misdemeanor, and shall, on conviction, be punished as provided in section 34, which has already been referred to; that any circuit court of this State, or any judge thereof, either in term time or vacation, upon application of any such commissioner, or officer, or board, may in his discretion compel the attendance of witnesses, the production of books and papers, and giving of testimony before the

commission, etc., by attachment for contempt or otherwise, in the same manner as the production of evidence may be compelled before said court.

We regard the question of the constitutionality of the act, so far as its constitutionality is attacked upon the ground that there is a supposed delegation of judicial functions to the civil service commissioners, as settled by the case of *Inter-State Commerce Commission* v. *Brimson*, 154 U. S. 447. The twelfth section of the Inter-State Commerce act passed by Congress provided, that the inter-State commerce commission should have power to require by subpœna the attendance and testimony of witnesses and the production of books, etc., relating to any matter under investigation; that, in case of disobedience to a subpœna, the commission might invoke the aid of any circuit court of the United States in requiring the attendance and testimony of witnesses, and the production of books and papers and documents under the provisions of said section; that any of the Circuit Courts of the United States, within the jurisdiction of which such inquiry was carried on, might, in case of refusal to obey a subpœna issued to any common carrier subject to the provisions of the act, or other persons, issue an order requiring such common carrier or other persons to appear before said commission, and produce books and papers, if so ordered, and give evidence touching the matter in question; and that any failure to obey such order of the court might be punished by such court as a contempt thereof. In the *Brimson case, supra,* it was held that the provisions of said twelfth section, as above set forth, were not in conflict with the constitution of the United States; that the party subpœnaed to testify or to produce books and papers, was bound to obey the subpœna, if the testimony sought, and the books and papers called for, related to a matter under investigation, which the commission was legally entitled to investigate. The constitution of the United States provides, that "the judicial power shall extend to

all cases in law and equity arising under the constitution, the laws of the United States and treaties made, or which shall be made under their authority, * * * to controversies to which the United States shall be a party," etc. In that case, the Supreme Court of the United States held, that the issue, made before the Circuit Court upon the application of the commission for an order to compel the giving of testimony or the production of books and papers, was a "case" or controversy within the meaning of the Federal constitution, which authorized the Circuit Court to act; and that the judgment of the Circuit Court rendered in pursuance of such application was none the less judicial in its character, because the effect of it was to aid an administrative body in the performance of the duties legally imposed upon it by Congress in execution of a power granted by the constitution. As we understand the *Brimson case,* it also holds that, where an act of Congress made the refusal of a witness, duly summoned to appear and testify before the commission in respect to a matter rightfully committed to that body for examination, an offense against the United States punishable by fine or imprisonment or both, a criminal prosecution, or a proceeding by information, could be instituted against the party who had committed such offense.

The constitution of Illinois (art. 6, sec. 12), provides that "the circuit courts shall have original jurisdiction of all causes in law and equity," etc. In the Civil Service act, the commission is authorized to subpœna witnesses to testify and to produce books and papers in the investigation of a matter, which is clearly within their power to investigate for the reasons already stated. This being so, upon the refusal of the witness to obey the subpœna, the application of the commission to the circuit court for an order requiring such persons so to appear before the commission and give evidence or produce books and papers, would constitute such a case as would authorize the circuit court to act. The judicial function

is performed by the court, and not by the commission. The commission is not authorized to punish the party for contempt, but the circuit court, upon application of the commission, makes the order to produce the papers, and, upon failure to obey the order, inflicts the punishment as for a contempt. There is here no delegation of the judicial functions to the commission, but simply a provision for the exercise of judicial functions by the circuit court.

The views here advanced do not conflict with the decision of this court in *Puterbaugh* v. *Smith*, 131 Ill. 199, which latter case was decided before this question was passed upon by the Supreme Court of the United States in *Inter-State Commerce Commission* v. *Brimson, supra.* It was held in the *Puterbaugh case*, that so much of a certain act entitled "Evidence," as authorized a judge in vacation to punish in a summary manner by fine and imprisonment, or fine or imprisonment, a person, who should refuse to obey a subpœna of a notary public to appear and have his deposition taken, or to subscribe his name to a deposition, was unconstitutional; but the decision in that case was placed upon the ground, that the witness there merely acted in contempt of the notary's authority, and not in contempt of the authority of the circuit court. Here, however, the Civil Service act does not provide for punishment of the party for failing to obey the subpœna of the commission, but for failing to obey the order made by the circuit court. When the application is made by the commission or commissioners, the court is authorized to compel the attendance of witnesses, by attachment for contempt or otherwise, "in the same manner as the production of evidence may be compelled before said court." The orderly course of the proceeding would require, that an order should be made requiring the witness to testify, and that it should appear that the witness refused to obey said order before the punishment for contempt could be inflicted upon him. The phraseology of section 33 involves the making of such order as a preliminary step,

before the punishment is inflicted. We are of the opinion, that the act is not unconstitutional as delegating judicial power to the commission. But, even if the provision, authorizing the commission to make application to the circuit court in the manner stated, was unconstitutional, it would not necessarily follow that the whole act should fall because of such unconstitutional provision. Where one provision in an act is in conflict with the constitution, but is so independent of other provisions that, without it, the latter are complete and fully capable of execution, the act will be construed the same as if the void part had never been inserted. (*Dupee* v. *Swigert*, 127 Ill. 494).

It is claimed by counsel for the respondent, Kipley, that the law is unconstitutional, as violating those sections of the constitution which secure the right of trial by jury. The right of trial by jury is not violated by the provisions of the Civil Service act which provide for the summoning of witnesses, and the requiring of such witnesses to testify, and to produce books, papers, etc., and which further provide, that, in the event of their failure to obey the order of the court in this regard, they shall be punished for contempt. The issue presented by these provisions is not one for the determination of a jury. It is an issue of law exclusively, and not of fact. In matters of contempt, a jury is not required by due process of law. (*Inter-State Commerce Commission* v. *Brimson, supra; Application of Clark*, 65 Conn. 171).

Counsel also contends, that section 12, which provides for the trial of charges against appointees, violates the constitutional right of trial by jury. This is said to be so, upon the alleged ground that the office, from which the officer or employe is to be removed or discharged in case the charges presented against him are sustained, is, with its attending emoluments, the property of the office holder; and that no man can be deprived of his property without a trial by a jury of his peers. This position is

wholly untenable. A public office is not property, nor are the prospective fees of an office the property of its incumbent. An office is a mere right to exercise a public function or employment. It is not the subject of sale, purchase or incumbrance. The term "office" implies a delegation of a portion of the sovereign power of the government to the person filling the office. Its duties are to be performed for the benefit of the public and in the public interest. (19 Am. & Eng. Ency. of Law, 381, 382). In *Donahue* v. *County of Will*, 100 Ill. 94, it was held that a law, which authorized county boards to remove county treasurers from office for certain violations of their duties, was not unconstitutional; that the removal of an official from office was not a judicial act, and, in that case, could be performed by the county board. In the *Donahue case, supra*, the contention that, under the constitutional provision prohibiting any person to be deprived of his property without process of law, a county treasurer could only be deprived of his office by a trial and judgment in a court of law, was held to be wholly untenable. We there said (p. 103): "It is impossible to conceive how, under our form of government, a person can own or have a title to a governmental office. Offices are created for the administration of public affairs. When a person is inducted into an office, he thereby becomes empowered to exercise its powers and perform its duties, not for his, but for the public benefit. It would be a misnomer and a perversion of terms to say that an incumbent owned an office, or had any title to it." In *State* v. *Hawkins*, 44 Ohio St. 98, the Supreme Court of Ohio said: "The incumbent of an office has not, under our system of government, any property in it. His right to exercise it is not based upon any contract or grant. It is conferred on him as a public trust to be exercised for the benefit of the public." If the removal of a county official for cause does not involve the exercise of judicial power, then certainly the removal of a municipal officer is not the ex-

ercise of judicial power. (*State* v. *Hawkins, supra*). The legislature has the power to control the municipalities created by it. Such municipalities must look to the State for such charters of government as the legislature shall see fit to provide; and, while they have a right to manage their own local concerns and choose their own administrative and police officers, yet this right is subject to such exceptions as the legislative power of the State may see fit to make. (Cooley's Const. Lim.—6th ed.—pp. 203, note, 227, 231). Therefore, the legislature may direct how municipal officers shall be elected or appointed by the cities and villages in the State, and how such officers may be removed. Moreover, the provisions of the Civil Service act for the removal or discharge of officers or employes upon written charges are purely statutory provisions. The constitutional provision, that "the right of trial by jury as heretofore enjoyed, shall remain inviolate," was not intended to introduce the right of trial by jury into special summary jurisdictions unknown to the common law, and not providing for that mode of trial. (*People* v. *Hill*, 163 Ill. 186).

It is further claimed that the law is unconstitutional, as being special legislation. This contention also is without force, as the law itself provides for its operation only in those cities, which by a vote of the people may adopt it. Laws of this character are not obnoxious to the constitutional inhibition against special legislation. (*People* v. *Hoffman*, 116 Ill. 587). The present law has been adopted by the people of the city of Chicago.

Counsel for the respondent, Kipley, also contends that section 35 of the act is unconstitutional. Section 35 provides that "if any person shall be convicted under the next preceding section, any public office or place of public employment, which such person may hold, shall, by force of such conviction, be rendered vacant, and such person shall be incapable of holding any office or place of public employment for the period of five years from the

date of such conviction." We are inclined to agree with counsel, that the portion of this section, which makes the person therein referred to incapable of holding any office or place of public employment for the period of five years from the date of his conviction, is unconstitutional. Section 8 of article 2 of the constitution of this State provides that "no person shall be held to answer for a criminal offense unless on indictment of a grand jury, except in cases in which the punishment is by fine or imprisonment otherwise than in the penitentiary," etc. The act seems to contemplate prosecutions by information for the violation of its provisions. No person can be held to answer for any crime, for which an infamous punishment may be imposed by the court, without presentment or indictment by a grand jury. A crime, which subjects the party to a disqualification to hold office in case he is convicted of such crime, is an infamous crime. Disqualification from holding office, if inflicted as a punishment for crime, is an infamous punishment. (*Ex parte Wilson*, 114 U. S. 417). Here, section 35 of the act provides for punishing the party guilty of violating its provisions by disqualifying him from holding office. This is not a punishment by fine or imprisonment otherwise than in the penitentiary, and is in addition to such punishment by fine or imprisonment in the county jail, or by both fine and imprisonment, as is specified in section 34. So far, therefore, as the act provides for the infliction of punishment by a disqualification to hold office, where the prosecution is by information and not by indictment, it is in violation of section 8 of article 2 of the constitution. It is true, that section 35 provides that such disqualification shall only be for five years from the date of the conviction, but, as counsel have furnished us with no authority in favor of the position that a limitation of the disqualification to a period of years is different from a disqualification where no such limitation had been fixed, and have presented us in the briefs with no reasons or arguments upon the

subject, we assume that the disqualification for a limited period is as much an infamous punishment, as though it was not subject to any such limitation. But the obnoxious feature, which thus exists in section 35, may be eliminated from the act without invalidating its other provisions.

With the exception thus indicated, our conclusion is, that the act is not unconstitutional in any of the respects heretofore mentioned, and which have been called to our attention by counsel for the respondent, Kipley.

*Second*—The demurrers of the petitioner to the answers and plea raise a further question as to the proper construction of certain provisions of the Civil Service act. Section 3 of the act provides that "said commissioners shall classify all the offices and places of employment in such city, with reference to the examinations hereinafter provided for, except those offices and places mentioned in section 11 of this act. The offices and places so classified by the commission shall constitute the classified civil service of such city, and no appointments to any of such offices or places shall be made except under and according to the rules hereinafter mentioned." Section 6 provides that "all applicants for offices or places in said classified service, except those mentioned in section 11, shall be subjected to examination," etc. The plain meaning of these sections is, that the offices and places mentioned in section 11 are not to be classified under the act, and are excepted out of the operation of the provisions of the act. Section 11, which thus designates the officers excepted from the classified service, is as follows: "Officers who are elected by the people, or who are elected by the city council pursuant to the city charter, or whose appointment is subject to confirmation by the city council, judges and clerks of election, members of any board of education, the superintendent and teachers of schools, heads of any principal department of the city, members of the law department, and one private secretary of the mayor, shall not be included in such classified service."

The present controversy arises out of a difference of opinion between the petitioner and the respondents as to the meaning of the two clauses: "whose appointment is subject to confirmation by the city council," and "heads of any principal department of the city." Under ordinances existing at the time of the passage of the Civil Service act, certain departments of the municipal government of the city of Chicago, known as the department of police, the fire department, the department of health, the department of public works, the department of buildings, and the department of law, were in existence and in operation, having been created and established by such ordinances. By the terms of such ordinances, and in pursuance of a practice which had existed for many years, each of these departments had one head, and each of these heads was appointed by the mayor by and with the advice and consent of the city council. Thus, the ordinance in regard to the police provides as follows: "There is hereby created the office of superintendent of police, who shall be the head of said department of police." The fire ordinance provides as follows: "There is hereby created the office of fire marshal, who shall be the head of the fire department." The health ordinance provides as follows: "There is hereby created the office of commissioner of health, who shall be the head of said department of health." The ordinance in regard to public works provides as follows: "There is hereby created the office of commissioner of public works, who shall be the head of said department of public works." The ordinance in regard to buildings provides as follows: "There is hereby created the office of commissioner of buildings, who shall be the head of said department of buildings." The ordinance in regard to law provides as follows: "There is hereby created the office of corporation counsel, who shall be the head of the law department."

These ordinances further provide, that there shall be certain subordinates or assistants for each of these de-

partments, who are specifically named in the ordinance. By the terms of the ordinances, all of these subordinates or assistants, with a few exceptions to be hereinafter mentioned, were appointed in each department by the head of that department, either subject to the approval and consent of the mayor, or without such approval or consent. Thus, the ordinance in regard to police provides as follows: "There is hereby established an executive department of the municipal government of the city of Chicago, which shall be known as the department of police, and shall embrace the superintendent of police, an assistant superintendent of police, a secretary of the department of police, a secretary to said superintendent, one inspector of police for each police division, one captain of police for each police district, and such number of lieutenants, sergeants, detective sergeants, sergeants of detectives, desk sergeants, patrolmen, clerks, photographers, telegraphers and veterinary surgeons as has been, or may be, prescribed by ordinance."

The contention of the petitioner is, that the expression, "heads of any principal department of the city," as those words are used in section 11, means, when the act is applied to the city of Chicago, the following officers, to-wit: the superintendent of police, the fire marshal, the commissioner of health, the commissioner of public works, the commissioner of buildings, and the corporation counsel. On the contrary, the respondents who are civil service commissioners contend that the words, "heads of any principal department of the city," mean, not only the said officials who are designated as heads in the ordinances, but also certain subordinates or assistants named in the ordinances. For instance, in the present case it is contended by the civil service commissioners, that the assistant superintendent of police, the secretary of the department of police, and the inspectors of police, must be regarded as heads of the police department. The respondent, Kipley, further contends, that the captains of

police shall be regarded as heads of the police department. The same contention is made in regard to certain of the subordinates and assistants in the other departments above named.

Therefore, the question which is to be determined in this branch of the case is this: what was the meaning of the legislature when it provided in section 11, that "heads of any principal department of the city" should not be included in the classified service?

The practice, which has prevailed under a constitution or a statute for a long series of years unchallenged and unquestioned, can be resorted to as affording strong evidence of the meaning of any phrase or term used in such constitution or statute. (*Bunn* v. *People*, 45 Ill. 397; *Opinion of the Justices*, 138 Mass. 601). In determining the meaning of a statute, a court will have regard to existing circumstances, or contemporaneous conditions, and also to the objects sought to be obtained by the statute, and the necessity or want of necessity for its adoption. (*Hawes* v. *City of Chicago*, 158 Ill. 653). It is conceded by counsel on both sides in their arguments, that the legislature passed the Civil Service act with full knowledge of the ordinances of the city of Chicago, which designated each of the officers already named as the head of each of the departments above mentioned. The opinion of the corporation counsel, which is made a part of the answer of the respondent, Kipley, makes the following statement: "We find no difficulty in passing upon the question as to what are principal departments in the service of this city, as the ordinances of the city provide for such departments. They are the departments of public works, buildings, fire, health and police." The respondents, who are civil service commissioners, by adopting the answer of the respondent, Kipley, also adopt the statement as to what are the principal departments of the city. It is also admitted in the argument of counsel, that the appointment of all the six officers above named is made subject

to the approval of the city council. It is also conceded by counsel for the civil service commissioners, that the word "heads," as used in section 11, should be given the meaning which it had at the time of the passage of the Civil Service act.

The word, "department," had a well understood meaning, and had been used in prior statutes, and in the City and Village act itself, at the time when the Civil Service act was passed. Thus, in section 3 of article 7 of the City and Village act, the following words are used, to-wit: "Neither the city council, nor the board of trustees, nor any department or officer of the corporation," etc.; in section 17 of the same article, the city comptroller is authorized to require of all officers a statement of the condition and expenses of their respective offices or "departments;" section 2 of the act in regard to the police and firemen's relief fund, provides that "the superintendent or chief officer of the police department, the fire marshal or chief officer of the fire department," and other officials, shall constitute the board therein named; so, also, in the act of 1887 in regard to the police pension fund, section 2 speaks of the "superintendent or chief officer of the police department." (1 Starr & Cur. Stat.—2d ed.—pp. 727, 731, 835, 838). There can be no doubt, that the words, as used in section 11, were intended by the legislature to refer to heads of the principal departments, as they existed under ordinances then in force. At that time there was no principal department of the city government in Chicago, which had more than one head. Each department had a single head. Counsel say that, in the clause, "heads of any principal department of the city," the word "heads" is plural, and the words "any department" are singular, and that, therefore, the legislature must have contemplated, that there should be two or more heads in one department. In pursuance of this construction it is then contended, that certain subordinate officers in each department, such as the assistant superintendent of police,

the secretary of the police department, each police inspector and each captain of police may be regarded as one of the heads of the department of police. If it be true that, when the Civil Service act was passed, each principal department had only one head, and if it be also true, as is admitted, that the legislature had full knowledge of the ordinances giving one head to each principal department, then the legislature must have intended to refer to each single head of each principal department by the words used in section 11. If the legislature meant, that only heads of a department should be excluded from the classified service, then, where a department had only one head, such single head would not be excluded. Such a construction cannot be accepted as correct. The intention evidently was, that the head or heads of any principal department should be excepted. If there was only one head, such single head should be excepted; if there were two or more heads, they should be excepted. It might be that the legislature could or would create some department besides and outside of those existing at the time of the passage of the act, which should consist of several persons as heads, instead of one person. In such case, such heads would come within the meaning of section 11. But, so far as the city of Chicago is concerned, the departments at the time of the passage of the act had each only one head, and, therefore, the words used in section 11 must refer to such heads as then existed. In section 10 immediately preceding section 11, the legislature three times makes use of the expression "the head of the department," or the "head of any department," making use of the singular number. Section 10 provides that "the head of the department," etc., shall notify the commission of a vacancy. Therein, "the head of the department" is authorized, under certain circumstances, with the consent of the commission, to discharge a candidate. Therein, also, "the head of any department" is authorized, under certain circumstances, with the approval of

the commission, to make a temporary appointment. Section 10 also refers to "the head of the department" as the appointing officer. This feature of section 10 corresponds with the ordinances referred to, which make "the head" of each one of the six departments above referred to the appointing officer of most of the subordinates in his department, with a certain limited number of exceptions. It cannot be that, after the use in section 10 of the expressions which refer to one single head of a department, the legislature intended a different meaning, by the use of the words contained in section 11. The expression there used is merely a pluralizing of the expression used in section 10, so as to convey the idea, that, where there were several departments and one head in each department, there were heads of departments.

The construction contended for by counsel as to the meaning of the words, "heads of any department of the city," would not only destroy and nullify the Civil Service act itself, but would lead to confusion and uncertainty in its interpretation. If the expression "heads of any principal department," is not to be interpreted to have the meaning given to it in the ordinances in force when the act was passed, what rule of interpretation is to be adopted in determining who are the heads of any principal department, and how many heads there shall be? Counsel say, that it must be determined who are heads by applying certain tests. It is said that, where an employe is authorized to exercise control in the absence of the chief officer of the department, such employe ought to be considered a head. There is nothing in the act, which justifies the application of any such rule, in order to determine who are the heads. It is also said that, where an employe has charge of the hiring and employing of a large number of men, and the expenditure of large sums of money, and is to be appointed only with the mayor's concurrence, and whose position is next to that of the chief of the whole department, such an employe must be considered

a head of the division or department under his super-
vision. There is nothing in the act, which justifies the
application of any such test as is thus indicated. It is
also said, that, where any employe has confidential and
business relations with the chief officers in any branch
of the city service, he is to be deemed a head. This test
also is without sanction in any of the terms of the act.
All these tests ignore the fact, that the "heads" referred
to must be the heads of "any *principal* department," not
the head of a division, or a department under the super-
vision of a subordinate. The *"principal"* departments are
limited in number, being either six departments or seven
departments, if the department of finance is included,
and each of such departments, as has been already stated,
has only one head. If the construction contended for by
counsel is correct, then, when section 10 authorizes "the
head of the department" to notify the commission of a
vacancy, which one of such heads is to give such notice?
and why is not the direction that "the heads of the de-
partment" should give the notice, instead of a direction
that "the head" thereof should give it?

The construction thus contended for would prevent
the fulfillment of the object contemplated by the act
itself. If it be once held, that there can be other "heads
of any principal department" than those existing in the
ordinances at the time the act was passed, then new
"heads" may from time to time be created by the common
council, or the appointing officers; and every foreman,
who has a squad of men at work under him, will be con-
sidered the head of a department. The object of the law
is to provide for appointment to office upon the basis
of merit and fitness, as ascertained by competitive ex-
aminations which are open and free to all. But if the
doctrine is to prevail, that new heads of any principal
department may be created whenever the exigencies of
politics or the demands of partisan service require it,
appointments upon the basis of merit and fitness will

soon cease to be made. In addition to this, the act contemplates, that promotions shall be made from one grade of the civil service .to another upon the basis of ascertained merit and seniority in service and examination. If, however, every officer, who has a number of ' subordinates under him, is to be regarded as the head of a principal department, there can be no opportunity for promotion. If all are heads and all thus occupy the highest grades, there will be no lower grades from which subordinates can rise by promotion. Thus, the intention of the legislature in passing the act to make both original appointments and subsequent promotions depend upon merit, and upon merit as ascertained by examinations, will be defeated. It is well settled, that courts will construe an act of· the legislature, so as to give effect to the plain intention of the body, as embodied in the act. (*Soby* v. *People*, 134 Ill. 66). In so far as the administration of the Civil Service act is dependent upon the action of the judicial department, "it is entitled to, and doubtless will, receive a fair and liberal construction, not only according to its letter, but its true spirit and the general purpose of its enactment." (*People* v. *Roberts*, 148 N. Y. 360).

But section 11 also says that officers "whose appointment is subject to confirmation by the city council" shall not be included in the classified service. Counsel say, that the heads of the principal departments, as created in the ordinances already referred to, are officers whose appointment is subject to confirmation by the city council. It is, therefore, argued that, if the words, "heads of any principal department of the city," refer only to the single heads already referred to, then section 11 is subject to the criticism of a mere repetition in the matter of the excepted class. The theory of counsel seems to be this: when section 11 said that officers, whose appointment is subject to confirmation by the city council, shall not be included in the classified service, it said thereby that the head of each principal department, as named in

the ordinances, should not be included; and that, this being so, when it afterwards used the expression "heads of any principal department of the city," it merely repeated an exception which had been already made, if the construction contended for by the Attorney General is correct. It is true, that each head of each principal department comes under both designations in section 11, to-wit: the designation: "whose appointment is subject to confirmation by the city council;" and also the designation: "heads of any principal department of the city." But the same is true of several other officials mentioned in section 11. Thus, the section mentions judges and clerks of election. Judges and clerks of election are included in the previous expression, to-wit: "Officers * * * who are elected by the city council pursuant to the city charter." This is so, because section 9 of article 4 of the City and Village act provides, that the city council shall appoint the judges and clerks of election. It may be said, therefore, that the mention of judges and clerks of election in section 11 is a mere repetition of the designation of those officials, which had already been made under the designation of officers elected by the city council pursuant to the city charter. Section 11 mentions, as persons not included in the classified service, "members of any board of education." But "members of any board of education" are included in the previous designations of officers elected by the people, and of officers whose appointment is subject to confirmation by the city council. This is so, because section 2 of article 6 of the School law provides that, in school districts having not over 100,000 inhabitants, there shall be elected a board of education, while section 17 of that act provides that, in cities having more than 100,000 inhabitants, the board of education shall be appointed by the mayor by and with the advice and consent of the common council. (3 Starr & Cur. Stat.— 2d ed.—pp. 3691, 3695). So, also, in reference to members of the law department as mentioned in section 11, the

corporation counsel, who is the head of that department, is an official whose appointment is subject to confirmation by the city council.

Section 11 designates certain officers with reference to the mode of their appointment, to-wit: election by the people or election by the city council, or appointment subject to confirmation by the city council. It then proceeds to designate certain officials, who may be selected by one or more of the three modes already specified. The fact, therefore, that the mention of "heads of any principal department of the city" is a repetition of a class previously designated, has no particular significance, except in the light of the views hereafter expressed upon that subject.

It is a well settled rule of construction, that, where there are two provisions, one of which is general and designed to apply to cases generally, and the other is particular and relating to one subject, the particular provision must prevail, and must be treated as an exception to the general provision. (*Dahnke* v. *People*, 168 Ill. 102). Section 3 provides that the commissioners shall classify all the offices and places of employment in the city with reference to the examinations provided for, except the offices and places mentioned in section 11; and it further provides that no appointment to any of such offices or places shall be made, except under and according to the rules provided for in the act. When these words of section 3 are applied to section 11, section 11 means, that all officers and employes of "any principal department of the city," except the "head" or "heads" thereof, shall be included in the classified service. This is a broad and general direction, but there is an exception to it. Wherever there is any officer, whose appointment is subject to confirmation by the city council, provided the office filled by him had been created and was in existence when the act was passed, such officer is not to be included in the classified service, even though he be a subordinate in one of

the principal departments of the city. The same is true, if such officer is one elected by the people, or elected by the city council. Thus, in the department of law the ordinance provides that that department shall embrace the corporation counsel, the city attorney, the prosecuting attorney, and such number of assistants and clerks, as the city council may by ordinance see fit to prescribe and establish. The corporation counsel is made the head of the law department, but the city attorney is an officer who is elected by the people. He, therefore, is not included in the classified service. So, in the ordinance in regard to the department of health, it is provided that that department shall embrace the commissioner of health, the superintendent of police, and others. Although the commissioner of health is made the head of the department of health, yet as the superintendent of police is an official, whose appointment is made by the mayor subject to confirmation by the city council, the superintendent of police is an officer who is not included in the classified service. Still again, the ordinances create a department of finance, of which the city comptroller is made the head. It is provided that this department of finance shall embrace the city comptroller, the city treasurer, and others. But as the city treasurer is an officer who is required by the statute to be elected by the people, he is not included in the classified service. We are inclined to the opinion that, if any member of any principal department of the city is an official whose appointment is made by the mayor subject to confirmation by the city council, he is not to be included in the classified service, notwithstanding he may not be made the head of the department. Thus it would appear, that the two clauses, "officers whose appointment is subject to confirmation by the city council," and "heads of any principal department of the city," should be construed together, in order to make them consistent with each other.

It seems to be contended by counsel for the respond-
ent, Kipley, that, inasmuch as officers whose appointment
is subject to confirmation by the city council are excepted
from the operation of the act, the common council may
by ordinance increase the number of officers so to be ap-
pointed, and thereby increase the number of exceptions
under section 11. Accordingly, the plea filed by the re-
spondent, Kipley, sets up the ordinance of June 28, 1897,
which is fully described in the statement of facts preced-
ing this opinion. That ordinance requires, that certain
subordinate officers or employes in certain of the princi-
pal departments of the city government shall be "desig-
nated as heads of principal departments," as said term is
used in section 11 of the Civil Service act, "and shall be
nominated by the mayor and shall be confirmed by the
city council." This ordinance was passed by the city
council of Chicago after the present proceeding was com-
menced in this court, and after the petition and answers
had been filed and demurred to. If it is a valid ordinance
and has the effect which it was intended to have, it will
certainly nullify and make worthless the Civil Service
act. Its passage is not defended or endorsed by the re-
spondents, who are civil service commissioners. We have
held, that ordinances passed by the common council must
be reasonable in order to be valid, and that they must
spring from an honest exercise of legislative discretion.
(*City of Bloomington* v. *Chicago and Alton Railroad Co.* 134 Ill.
451; *Hawes* v. *City of Chicago, supra*). The Civil Service law
is binding as well upon the common council of the city, as
upon the other persons mentioned in the act. (*Peck* v. *Bel-
knap,* 130 N. Y. 394). The ordinance assumes to define the
meaning of the words "heads of any principal department
of the city," as those words are used in the Civil Service
act. The power to interpret and construe a statute, or
to define the meaning of the terms therein, rests with
the courts, and not with the legislature, and certainly
not with a subordinate legislative body, like the common

council of a city. (23 Am. & Eng. Ency. of Law, 449). The ordinance does not create any new office or any new department, but simply provides that certain subordinate officials in departments already created shall be designated as heads of principal departments, and shall be appointed in a different manner from that, in which existing ordinances require them to be appointed. Such an ordinance is invalid as being beyond the power of the common council to pass it, in view of the provisions of the Civil Service act and of the City and Village act. As has already been stated, sections 3 and 11 of the Civil Service act provide in effect, that all the subordinate officers and employes of any principal department of the city shall be embraced within the classified service. The ordinance of June 28 provides in effect, that certain designated subordinates in the principal departments of the city government shall not be included in the classified service. The ordinance is, therefore, directly in the teeth of the statute.

This will further appear from a consideration of the meaning of sections 2 and 3 of article 6 of the City and Village act, as those sections bear upon, and have reference to, the ordinances herein before mentioned, which existed at the time of the passage of the Civil Service act. Section 2 of said article 6 provides, that "the city council may, in its discretion, from time to time, by ordinance, passed by a vote of two-thirds of all the aldermen elected, provide for the election by the legal voters of the city, or the appointment by the mayor with the approval of the city council, of a city collector, a city marshal, a city superintendent of streets, a corporation counsel, a city comptroller, or any or either of them, and such other officers as may by said council be deemed necessary or expedient. The city council may, by a like vote, by ordinance or resolution, to take effect at the end of the then fiscal year, discontinue any office so created, and devolve the duties thereof on any other city officer," etc. Section 3

provides, that "all officers of any city, except where herein otherwise provided, shall be appointed by the mayor (and vacancies in all offices except the mayor and aldermen shall be filled by like appointment) by and with the advice and consent of the city council. The city council may, by ordinance not inconsistent with the provisions of this act, prescribe the duties and define the powers of all such officers, together with the term of such office," etc. (1 Starr & Cur. Stat.—2d ed.—pp. 721, 722). Said section 2 provides for the creation of certain offices by ordinance passed by a vote of two-thirds of the aldermen elected. Section 2 gives the council power to provide, in the manner therein stated, for such other officers than those specifically mentioned, as may by said council be deemed necessary or expedient. It thus provides for officers not specifically named in the section, and whose designation cannot be determined until the ordinance therein provided for is passed. In other words, the second section gives the common council power to provide in a certain way for the election or appointment of officers whose designation and duties are not mentioned in the statute, but whose designation and duties are to be fixed by ordinances to be subsequently passed. The object of the section cannot be accomplished without action on the part of the city council. Section 3 merely provides for the mode of appointing individuals to the offices created by section 2. The officers referred to in section 3 are the officers to be created by ordinance, as provided in section 2. For example, the common council of the city of Chicago, under the authority contained in section 2, provided for the appointment by the mayor with the approval of the city council of a superintendent of police. When the present mayor appointed the respondent, Kipley, to the position of superintendent of police, he appointed him under the authority contained in section 3. Section 2 creates the office, section 3 provides for the appointment of an individual to the office so created. The ordinance men-

tioned in section 2 creating the office must be passed by a two-thirds vote of the aldermen elected, but the confirmation provided for by section 3 may be accomplished by a majority vote.

From what has been said it is apparent, that the words "whose appointment is subject to confirmation by the city council," as used in section 11 of the Civil Service act, refer to officers whose appointment was subject to such confirmation at the time the Civil Service act went into force. The words used are "*is subject*," not "*may be subject*" by some future action of the council. Section 11 refers, by the use of the words last quoted, to officers whose positions had then already been created by virtue of the power contained in section 2 of article 6 of the City and Village act. It could not refer to officers whose positions might thereafter be created, because in that view there were no officers whose appointment was subject to confirmation by the city council. The appointment of an officer, whose position has not yet been brought into being, can not be subject now and at the present time to confirmation by the city council. The words in section 11 refer to cases where the council had already acted under said section 2 of article 6. In the case at bar, the city council of Chicago had already passed ordinances providing for the appointment by the mayor, subject to confirmation by the city council, of the heads of the fire, police, public works, buildings, health and law departments. The appointments of these officials had been provided for when the act went into force, and they are referred to by the terms of section 11. They were then existing officials and were made exempt from the operation of the Civil Service law. It is true that, under section 2, the common council might discontinue an office created under section 2 where such an office was unnecessary, in order to devolve its duties upon some other officer. But the common council had no right to pass an ordinance, providing that subordinates in a department already created

should be elevated to be the heads of such department. To hold that it had such right, would be to hold that it could nullify the Civil Service act by making every person holding a position, however subordinate, an official whose appointment should be subject to confirmation by the city council, thereby taking his appointment out from the operation of the Civil Service act. To construe the act, so as to permit such a result as this, would be to construe it in opposition to the intention of its authors, and not with a view to carrying out such intention. The Civil Service act provides, that all laws or parts of laws, which are inconsistent with it or with any of its provisions, were thereby repealed. Hence, any provision, either of the City and Village act, or of any ordinance of the city, which provided for a different mode of appointment than that specified in the Civil Service act, was repealed, except so far as it might come within the exceptions named in section 11.

It is to be noted, that the words, "in all cases where it is practicable," are only used in the act in reference to the subject of promotion. The New York constitution, and the civil service acts passed by the legislature of that State, provided that appointments and promotions in the civil service should be made according to merit and fitness, to be ascertained "so far as practicable" by examinations. (*People* v. *Roberts, supra; Chittenden* v. *Wurster, supra*). But in the Illinois Civil Service act, this word "practicable" is not used in connection with the subject of examinations.

Our conclusion upon this branch of the case is, that the assistant superintendent of police, inspectors of police and captains of police, are not excepted from the operation of the Civil Service law by the provisions of section 11, or by any other provision in the act. The same is true as to all positions in the other principal departments of the city government herein mentioned, which are of a lower grade than the chiefs or heads of

those departments or which are subordinate to such chiefs or heads. This statement, however, is subject to this qualification, namely: that, wherever, at the time the Civil Service act was passed, an office or place of employment was one, the appointment to which was to be made by the mayor subject to confirmation by the city council, it is within the exception named in section 11 and is excluded from the classified service.

*Third*—Certain objections are made to the petition as a pleading. It is contended that the demurrer to the answers should be carried back to the petition. We do not regard the petition as defective in any essential particular. The right of *mandamus* lies to compel the performance of a public duty, or in the enforcement of a public right, and, in such case, no demand and refusal need be shown. (*Brokaw* v. *Commissioners*, 130 Ill. 482; *People* v. *Board of Education*, 127 id. 613). The respondents, who are made parties to the petition, are the only necessary parties. (*Dement* v. *Rokker*, 126 Ill. 174). The answers neither admit nor deny some of the averments in the petition. Wherever an averment of the petition well pleaded is not expressly denied in the answer, it must be taken to be true. (*Chicago and Alton Railroad Co.* v. *Suffern*, 129 Ill. 274.) A petition for *mandamus* must set forth a clear right on the part of the relator to have the act performed. It must also show, that it is the plain duty of the party, against whom the remedy is sought, to act in the premises. (*People* v. *Town of Mount Morris*, 145 Ill. 427; *People* v. *City of Elgin*, 66 id. 507). We are of the opinion that, in this case, a clear right is shown on the part of the relator and a clear duty on the part of the respondents. It was the duty, under the act, of the respondent, Kipley, to notify the commissioners of vacancies that existed in his department under section 10 of the act, and it was the duty of the civil service commissioners to certify to him the names and addresses of the candidates to be appointed to fill the vacancies in the manner prescribed in the act.

Accordingly, it is ordered that the writ of *mandamus* issue to the respondents, the one to give the notice, and the others to make the certification, as prayed in the petition.

*Writ awarded.*

Mr. CHIEF JUSTICE PHILLIPS, dissenting.

Mr. JUSTICE BOGGS, dissenting:

I concur in the view it was within the constitutional power of the General Assembly to enact the "Act to regulate the civil service of cities," but dissent from the conclusion that the law-making power intended that the phrase "heads of any principal department of the city," incorporated by the General Assembly in the 11th section, should be construed by the court to mean the "head" or chief officer, only, of such department. The appointment of the "head" or chief officer of "each principal department of the city" is subject to confirmation by the city council, and the General Assembly having declared, by a prior phrase in the same section, that "officers whose appointment is subject to confirmation" should be exempted from the operation of the act, it is not reasonably to be presumed or supposed the latter phrase was inserted merely as a repetition of the former, but that it was employed for the purpose of exempting from the effect of the act other officers than those included in the former exempting clauses. The construction given the phrase under consideration simply refuses to accord it any meaning or force whatever, and in effect expunges it from the act, for it is clear the section, as construed by the court, would be given the same effect if the phrase in question did not appear at all. The rejection of a portion of an act is only to be resorted to as a desperate and heroic remedy necessary to be employed for the preservation of the act itself.

It is a universal rule of construction, so frequently declared that the citation of authorities is superfluous, that

the words of a statute of common use are to be taken in their natural, plain, obvious and ordinary signification, "and that a plain, common sense interpretation of such words is to be accepted rather than a refined and technical grammatical construction." It must be conceded the meaning of the words "heads of a department" is not, in popular and common acceptation, at all a matter of doubt. It does not mean the "head," alone, of the department, but the chief or principal governing officers thereof. The meaning of the word in this instance is the word itself, and there is no occasion to invoke the refinements of construction to defeat it.